WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joseph Newman, | No. CV-13-08299-PCT-BSB (BSB) |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn W. Colvin, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Joseph Newman seeks judicial review of the final decision of the Commissioner of Social Security (the Commissioner) denying his application for benefits under the Social Security Act (the Act).  The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b), and have filed briefs in accordance with Local Rule of Civil Procedure 16.1.  The Commissioner also filed a notice of supplemental authority.  (Doc. 40.)  Plaintiff filed a document identified as a notice of filing a second amended complaint.  (Doc. 41.)  The Court construes that filing as a response to the Commissioner's notice of supplemental authority.  For the following reasons, the Court affirms the Commissioner's decision.

I.      **Procedural Background**

On June 21, 2010, Plaintiff applied for a period of disability and disability insurance benefits under Title II of the Act.[1]  (Doc. 18.)  He also applied for supplemental

_____

[1]  To qualify for disability insurance benefits, a claimant must establish disability on or before his date last insured.  20 C.F.R. § 404.101; *Tidwell v. Apfel*, 161 F.3d 599,

1  security income (SSI) under Title XVI of the Act.  (*Id.*)[2]   Plaintiff alleged disability
2  beginning September 30, 2003 due to a back injury (herniated disc) and a "skin condition
3  painful dermatitis."  (Tr. 18, Tr. 168.)  After the Social Security Administration (SSA)
4  denied Plaintiff's initial application and his request for reconsideration, he requested a
5  hearing before an administrative law judge (ALJ).  (Tr. 77-80.)  After conducting a
6  hearing, the ALJ issued a decision finding Plaintiff not disabled under the Act.  (Tr. 18-
7  27.)  This decision became the final decision of the Commissioner when the Social
8  Security Administration Appeals Council denied Plaintiff's request for review.  (Tr. 1-6);
9  *see* 20 C.F.R. §§ 404.981, 422.210(a) (explaining the effect of a disposition by the
10  Appeals Council).  Plaintiff now seeks judicial review of this decision pursuant to 42
11  U.S.C. § 405(g).

12  **II.    Administrative Record**

13       The record before the Court establishes the following history of diagnosis and
14  treatment related to Plaintiff's health.  The record also includes a lay opinion and
15  opinions of state agency physicians who examined Plaintiff and reviewed the records
16  related to Plaintiff's impairments, but who did not provide treatment.

17       **A.    Medical Evidence Before Plaintiff's June 2010 SSI Application**

18       The record includes records of medical treatment beginning in March 2009.[3]  On
19  March 4, 2009, Plaintiff sought treatment at North Country Healthcare (North Country)
20  for a wound on his lower left leg and was assessed with cellulitis.  (Tr. 240.)  On

---

601 (9th Cir. 1998).  Here, Plaintiff did not submit any medical evidence documenting
his condition on or before his June 30, 2004 date last insured.  (Tr. 20, 22, 93.)  Thus,
Plaintiff could not show he qualified for disability insurance benefits.  20
C.F.R. §§ 404.1512(a) (claimant has the burden to prove disability), 404.1512(c) ("You
must provide medical evidence showing that you have an impairment(s) and how severe
it is during the time you say that you are disabled.");  *Tidwell*, 161 F.3d at 601 (claimant
failed to establish that she had a severe impairment on or before her date last insured, as
required to qualify for disability insurance benefits).  Therefore, the Court affirms the
Commissioner's decision denying disability insurance benefits.  (Tr. 27.)

[2] Citations to "Tr." are to the certified administrative record.  (Doc. 29.)

[3] The record reflects that the SSA requested medical records from Dr. Ted Simon
in Sarasota, Florida, but his office denied having a patient with Plaintiff's name.
(Tr. 494.)

- 2 -

examination, Plaintiff had full strength, intact sensations and reflexes. (*Id.*) Plaintiff was noted to be "generally healthy." (*Id.*) Plaintiff was examined again at North Country on March 19, 2009. (Tr. 241.) The treatment notes from North Country indicate that the wound on Plaintiff's lower left leg had worsened, and he was referred to a surgeon. (*Id.*) Plaintiff had full strength, intact sensation, and normal reflexes. (*Id.*)

On March 21, 2009, Plaintiff sought treatment at Summit Healthcare Regional Medical Center (Summit) for the wound on his lower left leg. (Tr. 255.) The treatment notes state that Plaintiff had a tender, swollen, and painful lesion on his lower left extremity. (*Id.*) On examination, Plaintiff was in no acute distress, and was alert and oriented, he had a normal range of motion, non-tender extremities, no sensory or motor deficits, and a normal mood and affect. (Tr. 256.) He was assessed with cellulitis. (Tr. 255.)

That same day, Plaintiff was admitted to the medical floor at Summit for intravenous antibiotic therapy. (Tr. 260-61.) When asked about possible contributing factors to his wound, Plaintiff stated that he initially thought the wound was from an insect bite and said that he was in Central America in 2007. (Tr. 260.) Plaintiff was discharged several days later. (Tr. 259-60.) At that time, the burning and swelling in Plaintiff's leg had improved and he was in no acute distress. (Tr. 259-60.) Plaintiff was prescribed amoxycilin and topical antibiotics. (Tr. 259.)

Plaintiff returned to Summit on March 27, 2009. (Tr. 273.) The treatment notes reflect that Plaintiff complained of a rash or hives on his trunk and extremities and swollen lips. (Tr. 273.) It was noted that Plaintiff had been taking amoxycilin, and he was assessed with an allergic reaction to amoxycilin and advised to stop taking that medication. (Tr. 273, 277.) On examination, Plaintiff's extremities were non-tender, he had no edema, and a normal range of motion. (Tr. 274.) He was oriented, had a normal mood and affect, and no motor or sensory deficit. (*Id.*)

On April 14, 2009, Plaintiff followed up at Summit for the infection on his lower left leg. (Tr. 279.) Plaintiff reported swelling and itching and that his wound still

appeared to be infected.  (Tr. 279, 281.)   On examination, Plaintiff was in no acute distress, and he was alert and oriented.  (Tr. 281.)  He had non-tender extremities, a full range of motion, and no edema.  (*Id.*)  He was scheduled for intravenous therapy for cellulitis and was prescribed antibiotics.  (Tr. 280.)

On April 15, 2009, Plaintiff presented to North Country because he needed an order for a pic line for intravenous therapy for his cellulitis.  (Tr. 239.)  He was noted to be somewhat disheveled.  (*Id.*)  On examination, Plaintiff had full strength, intact sensations, and normal reflexes.  (*Id.*)  On April 15, 2009, Plaintiff started a course of outpatient intravenous therapy for the infection on his left leg.  (Tr. 288-91, 295.) Plaintiff was alert, calm, responsive, oriented, and was assessed with "0" pain.  (Tr. 290, 291, 295.)

On September 8, 2009, Plaintiff returned to North Country complaining of a swollen, red, burning, and itchy area on his left ankle.  (Tr. 238.)  The treatment notes refer to Plaintiff's March 2009 hospitalization for an infected wound in the same area. (*Id.*)  Plaintiff was assessed with cellulitis.  (*Id.*)  Plaintiff had a normal physical examination with full strength, intact sensation, and intact reflexes.  (*Id.*)  On September 16, 2009, Plaintiff returned to Summit complaining of pain, itching, and swelling in his left ankle.  (Tr. 297.)  Plaintiff had a normal physical examination, he was alert and oriented, and in no acute distress.  (Tr. 298-99.)  Except for his ankle, Plaintiff had non-tender extremities.  (*Id.*)  Plaintiff was diagnosed with dermatitis.  (Tr. 297-98.)

On September 17, 2009, Plaintiff was treated at Navapache Regional Medical Center for cellulitis.  (Tr. 303.)  On September 22, 2009, Plaintiff returned to Summit complaining of pain and swelling in his left foot or ankle and received follow-up care for cellulitis.  (Tr. 305-07.)  He had a normal physical examination with a full range of motion, he was alert and oriented, had a normal mood and affect, no motor or sensory deficit, and was in no acute distress.  (Tr. 306-07.)  Plaintiff was assessed with atopic dermatitis (eczema) and impetigo and was prescribed antibiotics.  (Tr. 306, 309.)

### B.    Medical Evidence after Plaintiff's June 2010 SSI application

#### 1.    Skin Lesion and Rash

Between April and early September 2010, Plaintiff received treatment for itching and a lesion near the base of his penis.  (Tr. 337-38, 340-44, 348, 372-78, 406, 437-58.) Plaintiff reported that he had the lesion for one year, and he believed that it was in an area where he was injured with splinters from wood.  (Tr. 372, 375.)  The lesion was diagnosed as condyloma.  (Tr. 437.)  During a July 7, 2010 examination, it was noted that Plaintiff also had a "follicular-type rash in both left and right side of his groan" that caused mild discomfort.  (Tr. 372.)  Plaintiff had the lesion excised and was prescribed prednisone for itching.  (Tr. 337-38, 436-37.)

#### 2.    Nurse Practitioner Marvin Depas

On November 10, 2010, Plaintiff saw nurse practitioner (NP) Marvin Depas at North Country with complaints of joint pain and "itchy skin."  (Tr. 370.)  Plaintiff had a normal gait and was in no acute distress.  (*Id.*)  He denied joint pain and did not have a skin rash at that time.  (*Id.*)

During a November 22, 2010 appointment with NP Depas, Plaintiff complained of a bump on his forehead and "skin itchiness [that] turn[ed] into hives."  (Tr. 379.) Plaintiff denied fatigue, dizziness, fever, headaches, feeling ill, night sweats, sleep disturbance, and weight loss.  (*Id.*)  On examination, Plaintiff was in no acute distress. (*Id.*)  NP Depas assessed a superficial, non-tender mass on Plaintiff's forehead that was not inflamed.  (Tr. 380.)  He did not note a rash or hives.  (*Id.*)

On December 22, 2010, Plaintiff returned to NP Depas after a rheumuatolgy consultation.  (Tr. 531.)  Plaintiff complained of back and joint pain.  (*Id.*)  Plaintiff reported that pain did not affect his activity level and stated that he did not need NP Depas to address any pain.  (*Id.*)  NP Depas prescribed medication used to treat fibromyalgia and referred Plaintiff for physical therapy.  (Tr. 531, 496-502.)  A depression screen was normal and Plaintiff did not report anxiety.  (Tr. 531-33.)

### 3.     Ken Epstein, M.D.

On referral from NP Depas, on December 7, 2010, Plaintiff saw Dr. Epstein for a rheumatology consultation.  (Tr. 487.)  Plaintiff reported a twenty-year history of lower back pain and complained of generalized joint and muscle pain in his shoulders, right knee, hands, and feet.  (*Id.*)  Plaintiff denied significant inflammatory joint swelling, joint heat or redness.  (*Id.*)  Plaintiff reported that he took a "rare" ibuprofen "with mild relief at times."  (*Id.*)  He reported a history of a rash, which Dr. Epstein stated seemed "like chronic urticaria," for which he reportedly took prednisone about three times a year. (Tr. 487.)  Plaintiff was not taking any medication at that time.  (*Id.*)

On examination, Plaintiff was in no acute distress, he was alert, oriented, and had a normal gait and station.  (Tr. 488.)  He did not have a rash.  (*Id.*)  Plaintiff exhibited discomfort getting on the examination table, lying down on the table, and dismounting from the table, mildly decreased range of motion in his shoulders, and a moderately decreased range of motion in his spine.  (*Id.*)  Plaintiff reported tenderness at fourteen out of eighteen tender point sites used to assess fibromyalgia.  (*Id.*)  Dr. Epstein assessed fibromyalgia, low back pain, and chronic urticaria.  (*Id.*)  He recommended medication for fibromyalgia (neurontin) and physical therapy.  (*Id.*)  He stated that he would obtain a rheumatology panel to rule out a systemic inflammatory condition.  (Tr. 488, 490-91.)  In his opening brief, Plaintiff states that he followed up with Dr. Epstein on January 20, 2012.  (Doc. 30 at 4.)  The record, however, does not include evidence of this appointment.

### 4.     Emergency Care Related to Alleged Incident with Police

In January 2011, Plaintiff went to the emergency room at Summit and reported that the police had forced him from his vehicle and hit, kicked, and tasered him. (Tr. 463.)  A CT scan of his thoracic spine showed mild narrowing of the cervical spinal column (cervical spinal stenosis).  (Tr. 464.)  X-rays showed osteoarthritis in his right shoulder, mild degenerative changes in his left shoulder, mild degenerative changes in his right ankle, and a normal left ankle.  (Tr. 465-68.)  Emergency room personnel diagnosed

1    bruises on Plaintiff's shoulders, ankles, and right elbow, cervical strain, and cervical
2    spinal stenosis.  (Tr. 463, 465-66, 468-69, 472-82.)

3            **5.      James Sielski, D.O.**

4            About a year later, in January 2012, Plaintiff saw Dr. Sielski at North Country
5    with complaints of body aches, muscles aches, and neck, back, and ankle pain.  (Tr. 520,
6    521.)  He also complained of a rash on both ankles.  (Tr. 521.)  Dr. Sielski noted that
7    Dr. Epstein "thought [Plaintiff] might have fibromyalgia."  (*Id.*)  Plaintiff stated that he
8    had been using only ibuprofen for pain.  (*Id.*)  On examination, Plaintiff was in no acute
9    distress, he had some tender points in his elbows but full range of motion in his neck,
10   normal mobility in his spine, normal strength and sensation, and a normal gait.  (Tr. 522-
11   23.)  Dr. Sielski assessed fibromyalgia and prescribed neurontin.  (Tr. 519-24.)

12           In a January 2012 letter to Plaintiff, Dr. Sielski stated that information from
13   Dr. Epstein "suggested" that Plaintiff had fibromyalgia.  (Tr. 519.)  He noted that lab
14   tests that Dr. Epstein ordered did not show any abnormalities, which was consistent with
15   fibromyalgia.  (*Id.*)  He stated that Plaintiff had "multiple bilateral tender points which
16   [were] consistent with fibromyalgia."  (*Id.*)  Dr. Sielski concluded that Plaintiff
17   "probably" had fibromyalgia "unless or until we can determine another diagnosis."  (*Id.*)
18   In March 2012, Plaintiff contacted Dr. Sielski's office by telephone and asked for a
19   prescription for physical therapy, stating "that it helped him out before."  (Tr. 518.)

20           In August 2012, Dr. Sielski wrote a letter to Plaintiff's attorney stating that
21   Plaintiff had been diagnosed with fibromyalgia and could not perform his past work as a
22   diesel engineer.  (Tr. 534.)  Dr. Sielski did not opine about Plaintiff's ability to do other
23   work and stated that a "formal physical capacity assessment might be beneficial to him to
24   help determine what his true capabilities are."  (*Id.*)

25           **C.      Opinion Evidence**

26           **1.      Larry Nichols, M.D.**

27           In mid-September 2010, Plaintiff presented to Larry Nichols, M.D., for a physical
28   examination for his application for Social Security benefits.  (Tr. 353-54.)  Plaintiff

complained of a skin condition and a herniated disc in his lower back.  (*Id.*)  Plaintiff reported a history of car accidents in the late 1980s and in 1990 and reported that he had a herniated disk.  (Tr. 353.)  An MRI of his lower back showed mild to moderate degenerative disc disease, but did not show a herniated disc.  (Tr. 351-52.)  Plaintiff stated that he could walk and sit for about ten to fifteen minutes each and that he had to change positions frequently.  (Tr. 354.)  Plaintiff also reported his treatment for a lesion between June and early September 2010.  (Tr. 354.)  He reported that he had almost finished his course of prednisone and was doing fairly well.  (*Id.*)

On examination, Plaintiff walked with a normal (nonantalgic) gait and could get in and out of a chair, on and off the examination table, and take his shoes off and put them back on without difficulty.  (Tr. 355.)  Straight leg raise tests were normal (negative) and Plaintiff had full muscle strength, intact sensation, and a normal range of motion in all of his joints, including his back.  (*Id.*)  Dr. Nichols did not find any tenderness or trigger points and Plaintiff did not have a skin rash at the time of the examination.  (Tr. 356.)  Dr. Nichols diagnosed Plaintiff with low back pain due to multiple injuries in the past leading to lumbar disc disease, and recent urological surgery to remove a lesion that was followed by a rash.  (Tr. 356.)  He opined that Plaintiff's conditions would not impose any limitations for twelve continuous months.  (Tr. 353-57.)

### 2.     Ronald Teed, Ph.D.

On September 28, 2010, Plaintiff saw Ronald Teed, Ph.D., for a psychological evaluation for his Social Security benefits application.   (Tr. 358-61.)   Plaintiff complained of back pain and a painful skin condition.  He reported that he had frequent itchy rashes, fatigue, headaches, sleep disturbance, and dysorexia. (Tr. 358.)  He reported trouble walking, climbing stairs, lifting, kneeling, and crouching.  (*Id.*)  Plaintiff also reported that he lived alone and could make a bed, clean a room, prepare basic meals, go out alone, take public transportation alone, drive, shop, and do yard work.  (*Id.*)  On examination, Plaintiff was alert, oriented, poised, and had adequate stamina.  (Tr. 359-60.)  Plaintiff had "slow cautious movement[s]," and "some difficulties with moving

about."  (Tr. 360.)  Plaintiff appeared tense but could repeat five digits forward and four digits backward, add four plus five, subtract four from eleven, and count backwards from 100 by threes (serial threes).  (*Id.*)  Dr. Teed opined that Plaintiff was cognitively intact and had an intact ability to comprehend multifaceted instructions.  (*Id.*)  He opined that Plaintiff's ability to follow through with and complete instructions was "limited somewhat by anxiety."  (Tr. 361.)

Dr. Teed completed a Medical Source Statement opining that Plaintiff had the ability to remember locations, work-like procedures, and detailed instructions.  (Tr. 361-62.)  He also found that Plaintiff's ability to maintain attention or concentration for extended periods and to sustain a normal routine was "moderately limited by somatic complaints (skin rash) related to anxiety."  (Tr. 362.)  He found that Plaintiff could respond appropriately to supervision and could be aware of normal hazards.  (*Id.*)  He recommended "[c]lassification of pain complaints and nature of skin rashes."  (Tr. 361.)

### 3.    State Agency Reviewing Physicians

On September 21, 2010, during the administrative proceedings, state agency physician Nadine Keer, D.O., reviewed the record and opined that Plaintiff had abilities consistent with medium work.  (Tr. 53-54.) *see* 20 C.F.R. § 416.967(c) (describing medium work).

On April 7, 2011, D. Rowse, M.D., reviewed the record as part of the Agency's review on reconsideration of the denial of Plaintiff's application for benefits, and opined that Plaintiff had abilities consistent with medium work.  (Tr. 66-67); *see* 20 C.F.R. § 416.967(c).  Dr. Rowse opined that "[t]here does not appear to be any physiological basis for [Plaintiff's alleged] limitations."  (Tr. 67.)

State agency psychologists Mary Downs, Ph.D., and Nicole Lazorwitz, Psy.D., reviewed the record and opined that Plaintiff had not shown a mental impairment that would significantly limit his mental ability to do basic work activities.  (Tr. 50-51, 67-68.)

**III.     Administrative Statements and Hearing Testimony**

  **A.     Plaintiff's Statements about his Functional Abilities**

   During the administrative proceedings, Plaintiff completed questionnaires about his functional abilities.  (Tr. 175-77, 196-207.)  On August 4, 2010, Plaintiff completed an Exertional Daily Activities Questionnaire and reported that he handled his own self-care, prepared food, cleaned house, paid bills, drove, and ran errands to the store, post office, and gas station.  (Tr. 175-77.)  He stated that "depending on severity," he could not stand due to lower back pain.  (Tr. 175.)  He stated that he broke out "all over with itching rash with swelling and fever," and that his doctor prescribed prednisone.  (*Id.*)  He described his rash as "continuous."  (Tr. 177.)  Plaintiff stated that he could walk ten feet from the house to his car, and twenty to thirty feet to the store.  (Tr. 175.)  In response to what chores Plaintiff performed and for how long, Plaintiff stated that he cooked for thirty minutes at a time, "clean[ed] self [for] 2 hours," and "house day."  (Tr. 176.)  He stated that he slept eight to fifteen hours and that he sometimes napped for eight hours a day.  (*Id.*)

   On February 4, 2011, Plaintiff completed another Exertional Daily Activities Questionnaire and stated that during a typical day he slept, ate, cleaned, stretched, rested, paid bills, and went to doctor's appointments.  (Tr. 196.)  He reported constant pain in his neck, shoulders, knees, and lower back that sometimes prevented him from sitting up or getting out of bed.  (*Id.*)  He said he could walk across the room, and that he could lift twenty-five pounds.  (Tr. 196-97.)  He stated that he washed dishes once a week and swept once a month.  (*Id.*)  He stated that he drove.  (*Id.*)  He stated that he slept ten to twelve hours per day and napped once a day for two hours.  (*Id.*)

   Plaintiff completed a Function Report on February 25, 2011.   (Tr. 199-207.)  Plaintiff reported that he had headaches and severe pain in his lower back, shoulders, necks, and legs that "prevent[ed] movement."  (Tr. 199-200, 206.)  Plaintiff attributed his pain to a herniated disk in his low back and fibromyalgia.  (Tr. 206.)   He reported difficulty lifting, squatting, bending, reaching, and climbing stairs.  (Tr. 204.)  He stated

that he got along well with authority figures and handled stress and changes in routine very well.  (Tr. 205.)   Plaintiff stated that during a typical day he swept, did dishes, rested, ate, read, took medication, did physical therapy, and slept.  (Tr. 200.)  He later stated that he swept or mopped and cleaned house once a month.  (Tr. 202.)  He stated that he prepared simple meals, but it hurt to use a knife.  (Tr. 201.)  Plaintiff also stated that he drove and shopped for groceries twice a month for four to five hours at a time. (Tr. 202.)   Plaintiff reported that he could pay bills, count money, handle a savings account, and use a check book.  (Tr. 203.)

### B.      Lay Opinion

On June 1, 2012, Plaintiff's mother wrote a letter to support Plaintiff's application for benefits.  (Tr. 233.)  She stated that in June 2000 she noted that Plaintiff had a skin rash on his back, legs, arm, feet, and torso.  (*Id.*)  She stated that she observed that the joints on Plaintiff's hands and feet were swollen and blistered.  (*Id.*)  She said that Plaintiff sought treatment at the Sarasota Memorial Hospital and Health South in Florida because he could not get out of bed or walk.  She reported that Plaintiff was diagnosed with rheumatoid arthritis and was prescribed pain relievers and prednisone.  (*Id.*)  She stated that Plaintiff improved somewhat between 2001 and 2003, but some days he stayed in bed all day due to pain.  (*Id.*)  Plaintiff's mother reported that in 2004 Plaintiff needed help getting in and out of a car and she suggested testing for fibromyalgia.  (*Id.*)

### C.      Administrative Hearing Testimony

Plaintiff was represented by counsel at the administrative hearing.   (Tr. 33.) Plaintiff testified that he mainly experienced pain in his lower back, but also had pain in his joints, arms, and neck.  (Tr. 41.)  He said that, with medication, his pain was a four or five out of ten (ten being the worst possible pain).  (*Id.*)  Plaintiff testified that since 2003 he had had rashes on his body "constantly" that had never gone away.  (Tr. 42.)  He attended weekly physical therapy sessions and also performed exercises at home. (Tr. 39.)  Plaintiff testified that he managed self-care, cooked, washed dishes, mopped and swept once a month, did laundry, shopped for groceries and drove.   (Tr. 38.)

1    Plaintiff estimated that he could lift five to ten pounds and stand and walk for between

2    five and fifteen minutes at a time.  (Tr. 40-41.)  He said that when pain limited his

3    functioning he became anxious.  (Tr. 41.)  Plaintiff stated that he did not receive mental

4    health care. (Tr. 40.)

5    **IV.    The ALJ's Decision**

6        A claimant is considered disabled under the Social Security Act if he is unable "to

7    engage in any substantial gainful activity by reason of any medically determinable

8    physical or mental impairment which can be expected to result in death or which has

9    lasted or can be expected to last for a continuous period of not less than 12 months."  42

10   U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard for

11   supplemental security income disability insurance benefits).  To determine whether a

12   claimant is disabled, the ALJ uses a five-step sequential evaluation process.  *See* 20

13   C.F.R. §§ 404.1520, 416.920.

14       **A.    The Five Step Sequential Evaluation Process**

15       In the first two steps, a claimant seeking disability benefits must initially

16   demonstrate (1) that he is not presently engaged in a substantial gainful activity, and

17   (2) that his medically impairment or combinations of impairments is severe.  20 C.F.R.

18   §§ 404.1520(b) and (c), 416.920(b) and (c).  If a claimant meets steps one and two, there

19   are two ways in which he may be found disabled at steps three through five.  At step

20   three, he may prove that his impairment or combination of impairments meets or equals

21   an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20

22   C.F.R. Part 404. 20 C.F.R. § 404.1520(a)(4)(iii).  20 C.F.R. §§  404.1520(d), 416.920(d).

23   If so, the claimant is presumptively disabled.  If not, the ALJ determines the claimant's

24   residual functional capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  At step four,

25   the ALJ determines whether a claimant's RFC precludes him from performing his past

26   relevant work.  20 C.F.R. §§ 404.1520(f); 416.920(f).  If the claimant establishes this

27   prima facie case, the burden shifts to the government at step five to establish that the

28   claimant can perform other jobs that exist in significant number in the national economy,

considering the claimant's RFC, age, work experience, and education.   20 C.F.R. §§ 404.1520(g), 416.920(g).   If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.

### B.    The ALJ's Application of the Five Step Evaluation Process

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date, September 30, 2003.   (Tr. 20.)   At step two, the ALJ found that Plaintiff had the following medically determinable impairments: "anxiety disorder, mild degenerative disc disease, and skin rash (20 C.F.R. § 416.920(c))."   (*Id.*)   The ALJ found that Plaintiff did not have an impairment or combination of impairments that significantly limited (or was expected to significantly limit) his ability to perform basic work-related activities for twelve consecutive months.   (*Id.*)   Therefore, the ALJ found that Plaintiff did not have a severe impairment or combination of impairments and was not disabled under the Act. (*Id.* at 20, 26.)   The ALJ did not reach the other steps in the sequential evaluation process.

After the ALJ's September 2012 decision, Plaintiff (through his then-counsel) submitted additional evidence to the Appeals Council, consisting of a November 2012 letter from Dr. Sielski.   (Tr. 235-36, 536).   In the letter, Dr. Sielski opined that, due to fibromyalgia, Plaintiff would have to continually change positions.   (Tr. 536.)   The Appeals Council found that the additional evidence did not provide a basis for changing the ALJ's decision.  (Tr. 1-6.)

### V.    Standard of Review

The district court has the "power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).   The district court reviews the Commissioner's final decision under the substantial evidence standard and must affirm the Commissioner's decision if it is supported by substantial evidence and it is free from legal error.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008).   Even if the

ALJ erred, however, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Substantial evidence means more than a mere scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted); *see also Webb v Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005). In determining whether substantial evidence supports a decision, the court considers the record as a whole and "may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal quotation and citation omitted). The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

## VI.    Plaintiff's Claims

Plaintiff asserts that the ALJ erred at step two of the sequential evaluation process by failing to find that Plaintiff's "itching skin rashes," degenerative spine disease, and fibromyalgia were severe, medically determinable impairments. (Doc. 30.) Plaintiff also asserts that the ALJ erred by discounting his symptom testimony and the lay opinion. (*Id.*)

### A.    Non-Severity Finding at Step Two of the Sequential Evaluation

At step two of the five-step sequential inquiry, the Commissioner determines whether the claimant has a medically determinable impairment or combination of impairments that is severe. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Step two is "a de minimis screening device [used] to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d at 1273, 1290 (9th Cir. 1996). The claimant has the burden of presenting evidence of medical signs, symptoms, and

laboratory findings that establish a medically determinable physical or mental impairment that is severe, and that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months.  *See Ukolov v. Barnhart*, 420 F.3d 1002, 1004-05 (9th Cir. 2005) (citing 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D)).

The Social Security Regulations and Rulings, and case law applying them, discuss the step two severity determination in terms of what is "not severe."  According to the regulations, an impairment or combination of impairments is not severe if it does not "significantly limit" the claimant's "physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c), 416.921(a).  Basic work activities are "abilities and aptitudes necessary to do most jobs," including "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling."  20 C.F.R. § 404.1521(b)(1), 416.921(b)(1).  They also include "seeing, hearing, and speaking," "[u]nderstanding, carrying out and remembering simple instructions," "us[ing] judgment," "[r]esponding appropriately to supervision, co-workers and usual work situations," and "[d]ealing with changes in a routine work setting."  20 C.F.R. §§ 404.1521(b)(2)-(6), 416.921(b)(2)-(6).  At the step two inquiry, the ALJ must consider the combined effect of all of the claimant's impairments on his ability to function, without regard to whether each alone is sufficiently severe.  *See* 42 U.S.C. § 423(d)(2)(B).

Applying the standard of review to the step two determination, the Court must determine whether substantial evidence supports the ALJ's finding that the medical evidence established that the claimant did not have a medically severe impairment or combination of impairments.  *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (citation omitted); *see also Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988) ("Despite the deference usually accorded to the Secretary's application of regulations, numerous appellate courts have imposed a narrow construction upon the severity regulation applied here.").  An ALJ properly finds that an impairment or combination of impairments is "not severe" if the evidence establishes a slight abnormality that has "no

1    more than a minimal effect on an individual's ability to work."  *Webb*, 433 F.3d at 686

2    (citation omitted).

3           At step two, the ALJ found that Plaintiff had the following medically determinable

4    impairments: anxiety disorder, mild degenerative disc disease, and skin rash.  (Tr. 20.)

5    The ALJ found that these impairments, alone or in combination, were not severe.  (*Id.*)

6    The ALJ also found that Plaintiff's fibromyalgia was not a medically determinable

7    impairment.  (Tr. 24-25.)  The Court considers whether the ALJ erred at step two.[4]

8                    **1.      Degenerative Disc Disease**

9           Plaintiff argues that the ALJ erred in failing to find degenerative disc disease a

10   severe impairment.  (Doc. 30 at 1.)  As discussed below, substantial evidence in the

11   record supports the ALJ's conclusion that Plaintiff's degenerative disc disease was not a

12   severe impairment.  (Tr. 23, 26.)

13          First, the imaging of Plaintiff's spine supports the ALJ's findings.  Imaging of

14   Plaintiff's spine in September 2010 showed mild compression of the superior vertebral

15   endplate at L1.  (Tr. 351.)  The remaining lumbar vertebrae were of "normal stature."

16   (*Id.*)  There was no other fracture or focal bony lesion seen.  (*Id.*)  The imaging also

17   showed mild to moderate degenerative disc disease and that Plaintiff's sacroiliac joints

18   were normal.  (*Id.*)  A CT scan of Plaintiff's cervical spine in January 2011 indicated

19   degenerative changes with mild spinal stenosis involving the lower cervical spine.

20   (Tr. 463.)   Some mild disc bulging was noted.  (*Id.*)  A January 2011 CT scan of

21   Plaintiff's thoracic spine showed old Scheuermann's disease, but was otherwise

22   unremarkable. (Tr. 464.)  Mild kyphosis was present.  (*Id.*)

23

24   _____

25          [4]  Plaintiff does not argue that that ALJ erred in finding that anxiety was not a
     severe impairment.  (Doc. 30.)  Rather, he argues that Dr. Teed erroneously attributed
26   Plaintiff's rash to anxiety.  (*Id.* at 4.)  Accordingly, the Court does not need to consider
     whether the ALJ erred in failing to find anxiety a severe impairment.  However, as the
27   ALJ noted, the record contains no treatment for anxiety.  (Tr. 22.)  Additionally, state
     agency psychologists Dr. Downs and Dr. Lazorwitz opined that Plaintiff did not have a
28   severe mental impairment.  (Tr. 22, 26, 50-51, 57-68, 359-61.)  Considering the record,
     the ALJ did not err in concluding that anxiety was not a severe impairment.

Second, as the ALJ noted (Tr. 23), Plaintiff routinely exhibited normal physical functioning on examination, including full strength and full range of motion.  (Tr. 238-40, 256, 274, 281, 298-99, 306-07, 355-56, 379.)  Plaintiff also reported that pain did not affect his activity level.  (Tr. 531.)  Additionally, state agency reviewing physicians found that Plaintiff was capable of medium exertional work.  (Tr. 54-54, 66-67.)

Therefore, considering the record evidence, substantial evidence supports the ALJ's conclusion that degenerative disc disease was not a severe impairment alone or in combination with Plaintiff's other impairments.

### 2.    Skin Rash

Plaintiff asserts that the ALJ erred in failing to consider his rash a severe impairment.  (Doc. 30 at 1, 3.)  Plaintiff asserts that he first experienced skin rashes associated with muscular pain in 1995 when he lived in Sarasota, Florida.  (Doc. 30 at 2.)  He asserts that he quit working in 2003 because the pain and itching associated with rashes prevented him from focusing or concentrating.  (Doc. 30 at 3.)  However, during the administrative proceedings, Plaintiff did not produce any medical evidence documenting his condition during that period.  Additionally, the record indicates that the Agency requested records from Dr. Ted Simon in Sarasota, Florida, and was informed that he did not have a patient by Plaintiff's name.  (Tr. 494.)

The record includes evidence that, from March through April 2009, Plaintiff received treatment for cellulitis that was possibly, but not definitively, related to an insect bite.  (Tr. 239-41, 255-56, 259-61, 279-81, 288-91, 295.)  In March 2009, Plaintiff was treated for rash that was attributed to an allergic reaction to medication.  (Tr. 273-77.)  In September 2009, Plaintiff was treated for dermatitis and impetigo.  (Tr. 305-09.)  The treatment notes related to those conditions state that Plaintiff was no in acute distress, was alert, oriented, and had a normal mood and affect, full strength, a normal range of motion, non-tender extremities, and no sensory or motor deficits.  (*See* Section II.A.)  Plaintiff also received treatment for a skin lesion between April and September 2010.

(Tr. 337-38, 340-44, 348, 372-78, 406, 437-58.)  The treatment records not indicate that the lesion affected Plaintiff's functional abilities.  (*Id.*)

State agency physician Dr. Nichols did not observe a rash when he examined Plaintiff in September 2010, and the reports of Plaintiff's subsequent physical examinations with other medical providers do not include evidence of a rash.  (Tr. 356, 370, 473, 488, 522-23.)  Dr. Nichols opined that Plaintiff did not have an impairment that would impose limitations for twelve continuous months.  (Tr. 356.)  Similarly, based on a review of the record, in October 2010, state agency reviewing physician Dr. Keer found that Plaintiff had a physical residual capacity for medium exertional work.  (Tr. 53-54.)  State agency reviewing psychologists Dr. Downs and Dr. Lazorwitz opined that Plaintiff had no limitations in activities of daily living and that he had only mild difficulties maintaining social functioning, concentration, persistence, and pace.  (Tr. 51, 68.)

In September 2010, state agency examining physician Dr. Teed attributed Plaintiff's reported skin rashes to anxiety.  (Tr. 362.)  His diagnosis of a skin rash was qualified as "per claimant."  (Tr. 361.)  Dr. Teed opined that Plaintiff had "no difficulties following directions and staying on task," he had an adequate ability to maintain attention and evaluate task, he had an intact "ability to generalize from a multifaceted problem or complex example," and adequate "[j]udgment or the ability to understand facts and draw conclusions . . . ."  (Tr. 360.)  He also found that Plaintiff had the "capacity to remember locations and work like procedures [and] to understand and remember detailed instructions," could respond appropriately to supervision, and be aware of normal hazards.  (Tr. 362); *see* 20 C.F.R. §§  404.1521(b)(2)-(6), 416.921(b)(2)-(6) (listing basic work activities).

As the ALJ found, the medical evidence in the record related to Plaintiff's skin rash or skin condition, does not indicate that that impairment had more than a minimal effect on Plaintiff's ability to work.   *See* 20 C.F.R. §§  404.1521(a), 416.921(a). Accordingly, the ALJ did not err in finding that Plaintiff's rash or skin condition was not a severe impairment alone or in combination with his other impairments.  Additionally,

as previously stated, the ALJ's determination that Plaintiff's skin rash was not a severe physical impairment is supported by the assessment of state agency physician Dr. Nichols who did not observe a rash on examination.  Dr. Nichols also noted that Plaintiff had a normal gait, could tandem and heel toe walk, could hop and squat, had a normal range of motion in all joints and his spine, a negative straight leg test, no paravertebral muscle spasms, no tenderness, full strength, intact sensation, and normal reflexes.  (Tr. 355-56.) Plaintiff argues that Dr. Nichols failed to see a rash that was present at the time of his examination and that he failed to acknowledge evidence of Plaintiff's pain.  (Doc. 30 at 6.)  Plaintiff's allegations are speculative and are not supported by credible evidence to undermine Dr. Nichols' examination findings.

**B.    Medically Determinable Impairment — Fibromyalgia**

Plaintiff argues that the ALJ erred in concluding that fibromyalgia was not a medically determinable impairment.  (Tr. 21, 24-25.)  The regulations provide that to establish fibromyalgia as a medically determinable impairment, a claimant must initially provide evidence that an acceptable medical source, such as a physician, diagnosed fibromyalgia.  SSR 12-2p, 2012 WL 3104869, at *2; *see also* 20 C.F.R. § 416.913 (identifying acceptable medical sources).  The evidence must show that the physician reviewed the claimant's medical history and conducted a physical examination.  *Id.*  The physician's treatment notes must be consistent with the diagnosis.  *Id.*

A claimant establishes fibromyalgia as a medically determinable impairment if a physician diagnosed it and the claimant meets either the 1990 American College of Rheumatology (ACR) Criteria for the Classification of Fibromyalgia, or the 2010 ACR Preliminary Diagnostic Criteria for fibromyalgia.  *See* SSR 12-2p, 2012 WL 3104869, at *2-3.  Specifically, the claimant must establish "widespread pain in the joints muscles, tendons or soft tissue that has persisted for at least three months," eleven of eighteen positive tender points on physical examination or repeated manifestations of six or more fibromyalgia symptoms or signs, and evidence that other disorders that could cause the

symptoms, signs, or co-occurring conditions were excluded by examinations or testing. SSR 12-2p, 2012 WL 3104869, at *2-3.

Dr. Epstein diagnosed Plaintiff with fibromyalgia based on a single examination. (Tr. 24, Tr. 488.)   The regulations state that, even if a physician has diagnosed fibromyalgia, the ALJ "cannot rely upon the physician's diagnosis alone" and must instead consider the physician's treatment notes to determine whether they are consistent with the diagnosis.  SSR 12-2p, 2012 WL 3104869, at *2.  Here, the ALJ correctly observed that the record only contains evidence of single appointment with Dr. Epstein. (Tr. 24, 488.)   During that examination, Plaintiff reported tenderness at fourteen of eighteen tender point sites and exhibited discomfort lying down on and dismounting from the examination table.  (*Id.*)  Dr. Epstein's limited treatment history with Plaintiff is a clear and convincing reason for discounting his diagnosis.  *See* 20 C.F.R. §§ 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

Additionally, as the ALJ noted, Dr. Epstein's treatment notes are in extreme contrast to Plaintiff's subjective complaints and observed behavior during an appointment with Dr. Nichols three months earlier.  (Tr. 24.)  Dr. Nichols found that Plaintiff had no paravertebral spinal spasms, tenderness, crepitus, effusions, deformities, or trigger points. (Tr. 355-56.)  Plaintiff did not report widespread pain.  (*Id.*)  Additionally, during the examination with Dr. Nichols, Plaintiff had no difficulty getting in and out of a chair, getting on and off the examination table, and taking his shoes off and putting them back on.  (*Id.*)

The ALJ also found that the record did not show a history of widespread pain, which is required to establish fibromyalgia as a medically determinable impairment under either set of ACR criteria.  (Tr. 24-25); *see* SSR 12-2p, 2012 WL 3104869, at *2-3. Substantial evidence in the record supports the ALJ's determination.  First, although the Disability Report that Plaintiff completed in June 2010 for his SSI application requests

1    information about all conditions affecting the claimant's ability to work, Plaintiff did not

2    include fibromyalgia or related symptoms on that report.  (Tr. 165-74.)

3         Second, Plaintiff did not report widespread pain during his September 2010

4    examinations with Dr. Nichols and Dr. Teed.   (Tr 353-56, 358-61.)   As set forth in

5    Sections II.A, II.B and II.C, the record reflects that Plaintiff did not mention widespread

6    pain during other examinations before his December 2010 examination with Dr. Epstein.

7    Later in December 2010, Plaintiff reported his diagnosis of fibromyalgia to NP Depas as

8    North Country, but he reported that pain did not affect his activity level and denied

9    having pain that he wanted NP Depas to address.  (Tr. 531.)

10        Third, as the ALJ noted, when Dr. Epstein diagnosed Plaintiff with fibromyalgia,

11   he had not ruled out other possible causes of Plaintiff's symptoms.  (Tr. 24, 488, 521);

12   *see* SSR 12-2p, 2012 WL 3104869, at *2; *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir.

13   1998) (noting that the record did not include a concrete diagnosis of fibromyalgia).

14        Fourth, the ALJ also considered Dr. Sielski's assessment of fibromyalgia in

15   January 2012.  (Tr. 24.)  Similar to Dr. Epstein, Dr. Sielski met with Plaintiff once and

16   had one telephone call with Plaintiff.    (Tr. 521.)    The regulations indicate that

17   "longitudinal records reflecting ongoing medical evaluation and treatment for acceptable

18   medical sources are especially helpful in establishing the . . . existence" of fibromyalgia.

19   SSR 12-2p, 2012 WL 3104869, at *3.  Thus, the ALJ properly considered Dr. Seilski's

20   limited history of treating Plaintiff in discounting his diagnosis of fibromyalgia.

21        Fifth, Dr. Seilski's assessment of fibromyalgia appeared to rely heavily on

22   Dr. Epstein's tentative diagnosis of fibromyalgia and, contrary to requirements for

23   establishing fibromyalgia as a medically determinable impairment, there is no evidence

24   that Dr. Seilski ruled out other disorders that could cause Plaintiff's reported symptoms.

25   (Tr. 520-23, 534); *see* SSR 12-2p, 2012 WL 3104869, at *2.  Finally, the ALJ also

26   considered Dr. Seilski's opinion that Plaintiff could not return to his past work as a diesel

27   engineer, but correctly observed that Dr. Seilski did not opine that Plaintiff was precluded

28   from all work.  (Tr. 25, Tr. 534.)  Additionally, that opinion does not indicate whether

Plaintiff had widespread pain or provide any other support for Dr. Seilski's diagnosis of fibromyalgia.  (Tr. 534.)

For these reasons, the Court finds that substantial evidence in the record supports the ALJ's conclusion that Plaintiff did not establish fibromyalgia as a medically determinable impairment.  *See* SSR 12-2p, 2012 WL 3104869, at *1-3.

### C.    Evidence of Impairments after the ALJ's Decision

Plaintiff also asserts that, after the ALJ's September 2012 decision, he was diagnosed with additional impairments.  (Docs. 30 at 2, 4, 7; Docs. 37, 41.)  However, a claimant's application for benefits remains in effect only until the ALJ issues her decision.  20 C.F.R. § 416.330.  Additionally, in 2013, Plaintiff filed a subsequent application for Social Security disability benefits, alleging disability based on the additional impairments.  (Doc. 30 at 1-2.)

The Commissioner argues that Plaintiff did not exhaust his administrative remedies for his 2013 application.  (Doc. 36 at 15.)  Plaintiff does not dispute that assertion.  (Doc. 37.)  Thus, his 2013 application for benefits it is not properly before the Court.  *See* 42 U.S.C. § 405(g) (court has jurisdiction to review the final decision of the Commissioner); *Califano v. Sanders*, 430 U.S. 99, 108 (1977) (the only civil action permitted on a Social Security disability claim is an action to review the "final decision of the [Commissioner] made after a hearing").

### D.    Subjective Complaints and Lay Opinion

#### 1.    Plaintiff's Subjective Complaints

Plaintiff argues that the ALJ erred in rejecting his subjective complaints. (Doc. 30.)  An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  *Garrison v. Colvin*, 759 F.3d 995, 1014-15 (9th Cir. 2014) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be

expected to produce the pain or other symptoms alleged.'"  *Lingenfelter*, 504 F.3d at
1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).

      If a claimant shows that he suffers from an underlying medical impairment that
could reasonably be expected to produce his pain or other symptoms, the ALJ must
"evaluate the intensity and persistence of [the] symptoms" to determine how the
symptoms, including pain, limit the claimant's ability to work.  *See* 20
C.F.R. § 404.1529(c)(1).  At this second evaluative step, the ALJ may reject a claimant's
testimony regarding the severity of his symptoms only if the ALJ "makes a finding of
malingering based on affirmative evidence," *Lingenfelter*, 504 F.3d at 1036 (quoting
*Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)), or if the ALJ offers
"clear and convincing reasons" for finding the claimant not credible.  *Carmickle*, 533
F.3d at 1160 (quoting *Lingenfelter*, 504 F.3d at 1036).

      Plaintiff testified that he had constant pain in his low back, joints, arms, and neck.
(Tr. 41.)  He also testified that he could walk five to ten minutes before needing to rest,
and that he could lift up to ten pounds.  (Tr. 40-41.)  He stated that since 2003 he had a
rash "constantly" that had not gone away.  (Tr. 42.)  The ALJ met the clear and
convincing standard and properly discounted Plaintiff's testimony as inconsistent with
the medical record, and as inconsistent with Plaintiff's prior statement that he could lift
twenty-five pounds and that he took only ibuprofen for pain.  *See* 20 C.F.R. §
404.1529(c)(4) (stating that an ALJ must consider "whether there are any inconsistencies
in the evidence"); SSR 96-7p, 1996 WL 374186, at *5 (stating that a strong indicator of
the credibility an individual's statements is their consistency, both internally and with
other information in the record); *Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2005)
("Credibility determinations do bear on evaluations of medical evidence when an ALJ is
presented with conflicting medical opinions or an inconsistency between a claimant's
subjective complaints and his diagnosed condition.").  As discussed in Sections II.A and
II.B, substantial evidence in the record supports the ALJ's credibility determination.

### 2.    Lay opinion

Plaintiff argues that the ALJ erred in rejecting his mother's opinion.  (Doc. 30 at 5.)  The ALJ must provide reasons "that are germane to each witness" when she rejects lay witnesses' testimony.  *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009) (an ALJ who disregards lay witness testimony must provide germane and specific reasons for each witness).  Plaintiff correctly asserts that the ALJ erred by rejecting his mother's statement based on her familial relationship with Plaintiff.  (Tr. at 27); s*ee Smolen*, 80 F.3d at 1289 (the fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony."); *Johnson v. Astrue*, 2008 WL 4553141, at *6 (C.D. Cal. Oct. 9, 2008) (stating that "the Ninth Circuit has consistently held that bias cannot be presumed from a familial relationship").

However, this error was harmless because the ALJ also found that her statement was inconsistent with the medical opinions and observations in the record.  (Tr. 26); *see* 20 C.F.R. § 404.1529(c)(4) (stating that an ALJ must consider "whether there are any inconsistencies in the evidence.")   "One [germane] reason for which an ALJ may discount lay witness testimony is that it conflicts with medical evidence."  *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).   The ALJ's finding is supported by substantial evidence in the record as discussed in Sections II.A and II.B.

## VII.   Conclusion

As set forth above, the ALJ's decision denying Plaintiff's application for a period of disability and disability insurance benefits and denying Plaintiff's application for supplemental security income is supported by substantial evidence in the record and is free of harmful legal error.

/ / /

/ / /

/ / /

/ / /

/ / /

1   Accordingly,

2   **IT IS ORDERED** that the Commissioner's disability determination is

3   **AFFIRMED**.   The Clerk of Court is directed to enter judgment in favor of the

4   Commissioner and against Plaintiff and to terminate this action.

5   Dated this 17th day of March, 2015.

6

7

8   _____

9   Bridget S. Bade
    United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28